UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
_____ DIVISION

Eastern District of Kentucky
F I L E D

JUL 1 3 2017

AT FRANKFORT
ROBERT R. CARR
CLERK U.S. DISTRICT COURT

THE UNITED STATES OF AMERICA, )
and THE STATE OF INDIANA, ex rel. )
RICHARD PARKEY )
PLAINTIFFS, )
)
VS. )   Civil Action No. 3/7 C V 53-6 FVT
)
UNITED SEATING AND MOBILITY, )
LLC, d/b/a NUMOTION )
DEFENDANT. )   FILED UNDER SEAL
)
_____ )

## COMPLAINT

### I.   INTRODUCTION

1.     This is a *qui tam* action under federal false claims, anti-kickback, and Stark laws. The FCA was enacted in 1863 in response to "widespread corruption and fraud in the sales of supplies and provisions to the union government during the Civil War." 132 CONG. REC. H9382-03 (daily ed. Oct. 7, 1986) (statement of Rep. Glickman). The law allows a private person with knowledge of a fraud to bring an *action* in federal district court for himself and for the United States and States and to share in any recovery. The party is known as a Relator, and the action that a Relator brings is called a *qui tam*.

2.     In this qui tam, Relator alleges that Defendant, United Seating and Mobility, LLC, under the assumed name of NuMotion (hereafter, "NuMotion"), doing business knowingly presented false and fraudulent claims and statements that were material to the government's decision to reimburse payment for mobility equipment and other medical devices. First, Defendant's claims were not supported by the requisite medical necessity. Second, Defendant itself generated the requisite Letters of Medical

Necessity ("LMN"), which is functionally a service given to providers at below market value in exchange for referrals. Third, NuMotion submitted false records for the purposes of reimbursement by removing language on the LMNs generated by NuMotion and by backdating. Fourth, NuMotion gave other kickbacks to providers such as a gift to Norton Hospital in Louisville, Kentucky ("Norton") and meals, drinks and other gifts. Fifth, the federal payors were billed for new parts, even if the parts were used. Finally, NuMotion failed to disclose the true cost of certain medical devices and products in a claim for reimbursement.

3.      Defendant's conduct harmed the United States, the Commonwealth of Kentucky, and the State of Indiana, thereby indirectly harming the taxpayer of each sovereign and the integrity of these important social programs. Upon information and belief, however, the misconduct alleged here occurred nationwide.

## II.    JURISDICTION.

4.      This Court possesses subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. §§ 3730 and 3732 because Relator seeks remedies on behalf of the United States for Defendant's violations of 31 U.S.C. § 3729, which occurred in the Eastern District of Kentucky and Western District of Kentucky.

5.      The original complaint was filed timely within the period prescribed by 31 U.S.C. § 3731(b). There was no public disclosure of the allegations or transactions set forth in this action prior to filing under 31 U.S.C. § 3730(e).

6.      This Court has personal jurisdiction over the Defendant and venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and (b) 28 U.S.C. §§ 1391(b) and (c) because the Defendant can be found in, resides, transacts or has transacted, or is qualified to do business in this District. During the period challenged by this action, the

2

Defendant regularly conducted business in this judicial district. Namely, Defendant has three practicing businesses in the state of Kentucky in Lexington, Louisville and Bowling Green. Additionally, one of the primary victims of Defendant's misconduct is the Kentucky Department of Medicaid Services, which is located in Frankfort, KY.

7.      Pursuant to 31 U.S.C. § 3730(e)(4)(B), Relator is the "original source" of the information provided to the United States regarding Defendant's illegal conduct in violation of Federal laws. Relator has direct and independent knowledge of the allegations set forth herein. The information concerning Defendant's misconduct was not disclosed publicly prior to Relator's original disclosure to the United States.

8.      The Court has jurisdiction over Relator's claims on behalf of the State of Indiana under its False Claims and Whistleblower Protection Act, Ind. Code §§ 5-11-5.5-1 to 5-11-5.5-18, pursuant to the federal False Claims Act, 31 U.S.C. § 3732(b).

## III.   PARTIES.

### A.   Plaintiff.

9.      Plaintiff United States of America brings this action by and through its administrative agencies, the Department of Health and Human Services, Centers for Medicare & Medicaid Services ("CMS"), the Department of Defense, the Department of Veterans Affairs, and the Office of Personnel Management which administer the Federal Payor Programs.

10.     Plaintiff, the State of Indiana, brings this action by and through its Family and Social Services Administration, which administers its Medical Assistance (Medicaid) program.

### B.   Relator.

11.     Relator, Lowell Richard Parkey, is an individual citizen of the United States and a resident of the State of Kentucky.  Parkey resides in Nelson County, Kentucky and was previously the area manager of NuMotion. Relator worked with Defendant from December 2007 until April 2014. During this time, he served in several management positions. First, he was the Branch Manager for Central Kentucky Mobility's Louisville office where he managed all operational activities of the local market. He then served as the Operations Manager, overseeing all operations for the entire company. Central Kentucky Mobility was purchased by United Seating and Mobility and he was promoted to Area Manager being responsible for all operations of offices in Kentucky and Indiana. In 2011, United Seating and Mobility merged with ATG Rehab to form NuMotion. He retained his title of Area Manager. Parkey managed all operations in the state of Kentucky and Indiana. As area manager, Parkey's duties included: oversight of operations and business, customer service, paperwork, leading sales and operations personnel; oversight in sales; management of the area budget; operation oversight with letters of medical necessity, certificates, assembly of parts and delivery of equipment to customers. By virtue of his position, Relator acquired direct and independent knowledge of the conduct described herein.

### C.   Defendant.

12.     Defendant, NuMotion is a Missouri limited liability corporation that is authorized to perform business in the Commonwealth of Kentucky and does in fact perform substantial business in Kentucky. Upon information and belief, NuMotion is a fictitious name for United Seating and Mobility, LLC. United Seating and Mobility was a Missouri corporation with its principal office in Connecticut. NuMotion's website,

4

however, states that its headquarters are located in Brentwood, TN. NuMotion has 130 branch locations across the United States.

13.     NuMotion was formed from a merger between ATG Rehab, an assumed name for ATG – Connecticut, Inc. and United Seating and Mobility. Prior to this merger, United Seating and Mobility purchased Central Kentucky Mobility, which is how Relator originally came to work for Defendant.

14.     Defendant provides specialized durable medical equipment, such as wheelchairs, scooters, beds, etc. Nationally, there are over 100 facilities that operate under the name "NuMotion". In Kentucky, NuMotion has locations in Lexington, Louisville, and Bowling Green. In Indiana, Defendant has locations in Fort Wayne, Evansville, South Bend, and Indianapolis. Relator was an area manager over Kentucky and Indiana.

15.     As set forth herein, NuMotion knowingly provided goods without medical necessity being established by an independent physician or therapist; wrote their own letters of medical necessity, a service that was used as a marketing tool to induce medical providers to send Defendant referrals; coached doctors regarding mobility issues to satisfy the required seven element written order; delivered unauthorized medical equipment by backdating; made donations to Norton in exchange for a kickback; provided gifts in excess of annual limit allowed such as, but not limited to, lunches, dinners and drinks on the company card; billed the federal payors a price for "new" medical equipment, even if the parts are used or to be rented; and received reimbursements from federal payors at an excess rate due to their failure to disclose manufacturer discounts.,

16.     Defendant may be served through its registered agent, CT Corporate Systems, 306 West Main Street, Suite 512, Frankfort, Kentucky 40601.

## IV.     THE FEDERAL PAYOR PROGRAMS.

### A.     The Medicare program

17.     In 1965, Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. § 1395 et seq., known as the Medicare program. Medicare is a health financing program that pays for the costs of certain services and care provided to eligible aged and disabled beneficiaries. Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease. 42 U.S.C. §§ 426, 426A.

18.     The Department of Health and Human Services ("HHS") is responsible for the reimbursement, administration, and supervision of the Medicare Program. The Centers for Medicare & Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration, is a component of HHS and is directly responsible for the administration of the Medicare Program. The rules governing the Medicare Program are set forth in the statute (the "Medicare Act"), regulations, and the manuals, rulings and other policy statements issued by CMS, including but not limited to the Provider Reimbursement Manual ("PRM") and the CMS Online Manual System ("MS").

19.     To be eligible for reimbursement under the Medicare Program, a provider of services is required to enter into a contract, known as a provider agreement, with HHS. 42 U.S.C. § 1395cc; PRM § 2402.2; Medicare General Information, Eligibility and Entitlement Manual (MS Pub. 100-1) Ch. 5 § 10.1. A provider is required to comply with the Medicare laws, regulations and policies governing the Medicare Program. MS Pub. 100-1 Ch. 1 § 20.3.

6

## B.     The Medicaid Program

20.     Title XIX of the Social Security Act ("Medicaid" or the "Medicaid Program") authorizes grants to States for medical assistance to children and blind, aged and disabled individuals whose income and resources are not sufficient to meet the costs of necessary medical care. 42 U.S.C. § 1396; 42 C.F.R. § 430.0; see 42 U.S.C. §§ 1396- 1396v. The Medicaid Program is jointly funded by the Federal Government and participating States. The amount of Federal funding in a State's program (Federal Financial Participation) is determined by a statutory formula set forth in 42 U.S.C. §§1396b(a) and 1396d(b).

21.     A State that elects to participate in the Medicaid Program must establish a plan for providing medical assistance to qualified beneficiaries. 42 U.S.C. § 1396a(a)-(b); see 42 C.F.R. Part 430, Subparts A and B; CMS State Medicaid Manual § 13025. In exchange, the Federal Government, through CMS, pays to the State the federal portion of the expenditures made by the State to providers, and ensures that the State complies with minimum standards in the administration of the Medicaid Program. 42 U.S.C. §§ 1396, 1396a, and 1396b.

22.     The State of Kentucky has elected to participate in the Medicaid Program, has established a State plan under the Medicaid Program, and has promulgated regulations that implement the State plan. See K.R.S. § 205.510 et seq. The Kentucky Cabinet for Health and Family Services, Department of Medicaid Services is the sole Medicaid agency that has contracted with HHS to administer or supervise the Medicaid Program in the State of Kentucky. K.R.S. § 205.510 et seq. See 42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10(b).

23.     Individuals or entities that provide services to Medicaid beneficiaries in Kentucky submit claims for payment to the Medicaid agency or its local delegate agency.

*See* 42 C.F.R. § 430.0. Payments are made based on types and ranges of services, payment levels for services, and administrative and operating procedures established by the State in accordance with Federal laws, statutes and rules. *Id.*

24.     Historically, Medicaid in Kentucky operated on a fee for service basis. However, Kentucky is now transitioning to a managed care system whereby a private Managed Care Organization (MCO) administers a health plan for a Medicaid member and receives a fee for each Medicaid member that it serves. In turn, the MCOs pay medical providers for services. While Defendant may have continued its fraudulent practices following the transition to MCOs, the conduct alleged here, about which Relator has direct and independent knowledge, occurred or began occurring when Kentucky operated on a traditional fee-for-service program.

25.     Similarly, the conduct alleged here, about which Relator has direct and independent knowledge, occurred or began occurring when Indiana operated on a traditional fee-for-service program.

### C.     Other Federal Payor Programs.

26.     The federal government also provides reimbursement for medical care under other healthcare programs.

27.     The Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS") (presently entitled "TRICARE"), 10 U.S.C. §§ 1071-1106, is a federally funded program administered by the Department of Defense. TRICARE/CHAMPUS provides medical benefits to certain active duty service members and their spouses and unmarried children, certain retired service members and their spouses and unmarried children, and reservists called to duty and their spouses and unmarried children. 32 C.F.R. § 199 et seq. TRICARE pays for its beneficiaries' medical procedures alleged herein.

28.     CHAMPVA is a healthcare program administered by the United States

29.     Department of Veterans Affairs for families of veterans with 100 percent service connected disabilities. CHAMPVA pays for its beneficiaries' medical procedures alleged herein.

30.     The Federal Employees Health Benefits Program ("FEHBP") provides health care coverage for qualified federal employees and their dependents. FEHBP pays for its beneficiaries' medical procedures alleged herein.

31.     The coverage and reimbursement criteria of these other federal payor programs mirror those of Medicare and Medicaid. The services provided beneficiaries must be reasonable and medically necessary. Health care providers are not permitted to seek reimbursement for services or procedures that are not reasonable or medically necessary.

## V.     THE LAW.

### A.     The FCA.

32.     The Federal FCA, 31 U.S.C. §§ 3729-3733, provides, *inter alia*, that any person who (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, or (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim made, is liable to the United States for a civil money penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(A)-(B).

33.     The Federal FCA also provides that any person who conspires to violate any provision of the Federal FCA is liable to the United States for a civil money penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(C).

34.     The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)- (iii). These terms "require no proof of specific intent to defraud." 31 U.S.C. §3729(b)(1)(B).

35.     The term "claim" is defined to mean "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ." 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

36.     The term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. 31 U.S.C. § 3729(b)(4).

37.     Under the FCA, misrepresentations by omission may give rise to liability. *See United Health Servs. v. United States ex rel. Escobar,* 136 S. Ct. 1989 (2016).

38.     Under the FCA, a defendant may be liable for violating statutory or regulatory requirements even if they are not considered explicit conditions of payment. In other words, a defendant may be liable if it knowingly violated a requirement that Defendant knows is material to the Government's decision to pay. *See United Health Servs. v. United States ex rel. Escobar,* 136 S. Ct. 1989 (2016).

**B.      Anti-Kickback Statute.**

39.      The Medicare and Medicaid Patient Protection Act of 1987, 42 U.S.C. § 1320a-7b(b) ("Anti-Kickback Statute"), provides criminal penalties of no more than $25,000 or five years in jail or both for the following:

> (1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind— (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program. . . .(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program
>
> * * *
> (2) whoever knowingly and willfully offers and pays any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person— (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program. (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program. 42 U.S.C. § 1320a-7b(b).

40.      The submission of a claim for health care services tainted by a violation of the Anti-Kickback Statute violates the FCA. The Patient Protection and Affordability Care Act ("PPACA"), Pub. L. 111-148, 124 Stat. 119, which was signed into law on March 23, 2010, specifically makes a violation of the Anti-Kickback Statute actionable under the FCA. PPACA amended the Anti-Kickback Statute to provide that a "claim that includes items or services resulting from a violation [of the Anti-Kickback Statute] constitutes a false or fraudulent claim" under FCA. H.R. 3590, § 6402(f)(1). Moreover, it also clarified that actual knowledge of the Anti-Kickback Statute or specific intent to commit an Anti-

11

Kickback Statute violation is not required for liability. Pub. L. 111-148 § 6402(f)(2). *See* 42 U.S.C. § 1320a-7b(g) and (h).

41.     A "federal health care program" is defined at 42 U.S.C. § 1320a-7b(f) as any plan or program providing health benefits funded, whether directly or indirectly, by the United States Government. The statute applies to the performance of medical procedures. It requires that the professional judgment of the provider, and not financial considerations, guide the decision to perform medical procedures.

42.     Federal regulations identify narrow "safe harbors" that do not violate the Anti-Kickback Statute. No safe harbor applies to the conduct alleged herein.

43.     Compliance with the Anti-Kickback Statute is a precondition to participation in the Federal Payer Programs and to receive payment from the United States under Medicare pursuant to 42 C.F.R. § 413.24(f)(4)(iv). For example, providers certify on CMS 855A when enrolling in Medicare that they "agree to abide by Medicare laws, regulations and program instructions that apply to me. . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal Anti-Kickback Statute and the Stark Law), and on my compliance with all application conditions of participation in Medicare." Therefore, by seeking payment from the United States, healthcare providers certify their compliance with the Anti-Kickback Statute, and the failure to comply renders the provider ineligible for payment.

C.     **The Medicare and Medicaid Overpayment Law.**

44.     PPACA, Pub. L. 111-148, §§ 6402(a), amended the Social Security Act to require that health care providers who receive an overpayment must report and return

the overpayment, typically within 60 days; any overpayment retained past the deadline is deemed an obligation under the False Claims Act. 42 U.S.C. 1320a-7k(d).

### D. The Stark Law.

45. The Ethics in Patient Referrals Act of 1989 § 6204, Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, 103 Stat. 2106 (Dec. 19, 1989) (codified at 42 U.S.C. § 1395nn) ("Stark I") as amended by the Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, § 13,562, 107 Stat. 312 (Aug. 10, 1993) ("Stark II"), the Patient Protection and Affordability Care Act, Pub. L. No. 111-148, §§ 6001(a), 6003(a), 124 Stat. 119 (Mar. 23, 2010), and the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, § 1106, 124 Stat. 1029 (Mar. 30, 2010) (collectively, "Stark Law") set forth extensive prohibitions on the referrals that are tied to financial gain.

> (1) In general—Except as provided in subsection (b) of this section, if a physician (or immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then—
>
> (A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and
>
> (B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).
>
> (2) Financial relationship specified—For purposes of this section, a financial relationship of a physician (or an immediate family member of such physician with an entity specified in this paragraph is—
>
> (A) except as provided in subsections (c) and (d) of this section, an ownership or investment interest in the entity, or
>
> (B) except as provided in subsection (e) of this section, a compensation arrangement (as defined in subsection (h)(1) of this section) between the physician (or an immediate family member of

13

such physician) and the entity.

An ownership or investment interest described in subparagraph (A) may be through equity, debt, or other means and includes an interest in an entity that holds an ownership or investment interest in an entity providing the designated health service.

42 U.S.C. § 1395nn(a)(1)-(2).

46.     The phrase "designated health services" is defined to include clinical services; physical therapy services occupational therapy services; radiology services, including magnetic resonance imaging, computerized axial tomography scans and ultrasound services; radiation therapy services and supplies; durable medical equipment and supplies; parenteral and enteral nutrients, equipment, and supplies; prosthetics, orthotics, and prosthetic devices and supplies; home health services; outpatient prescription drugs; inpatient and outpatient hospital services; and outpatient speech-language pathology services.

47.     A referral in violation of the Stark Law violates the FCA.

48.     Federal regulations identify narrow "safe harbors" that do not violate the Stark Law. *See* 42 C.F.R. § 411.350 *et seq*. No safe harbor applies to the conduct alleged herein.

49.     Compliance with the Stark Law is a precondition to participation in the Federal Payer Programs and to receive payment from the United States under Medicare pursuant to 42 C.F.R. § 413.24(f)(4)(iv). For example, providers certify on CMS 855A when enrolling in Medicare that they "agree to abide by Medicare laws, regulations and program instructions that apply to me. . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the

14

Federal Anti-Kickback Statute and the Stark Law), and on my compliance with all application conditions of participation in Medicare." Therefore, by seeking payment from the United States, healthcare providers certify their compliance with the Stark Law, and the failure to comply renders the provider ineligible for payment.

50.     The false certification of compliance with the Stark Law results in liability under the FCA.

51.     The federal-state Medicaid program in each state requires providers to comply with all Medicaid requirements in Federal laws. This includes, as a condition of payment, compliance with the Stark Law.

### E.     The Indiana False Claims and Whistleblower Protection Act

52.     The Indiana False Claims and Whistleblower Protection Act, Ind. Code §§ 5-11-5.5-1 to 5-11-5.5-18, provides, *inter alia,* that any person who (1) knowingly presents a false or fraudulent claim for payment or approval, or (2) knowingly uses a false record or statement to obtain payment or approval of a false claim from the state, is liable for a civil penalty plus treble damages. Like the FCA, a civil action for violation of the statute may be brought by a private person or Relator.

## VI.     DEFENDANT'S WRONGFUL CONDUCT

53.     Holding a position as an area manager from 2011 to 2014, Relator became familiar with many of the Defendant's operations, including Defendants' billing and reimbursement practices with the federal payors. As Area Manager, he had the responsibility of ensuring that predetermined budgetary goals were achieved by all branches under his supervision. This included ensuring that all required documentation was received in a timely manner, monitoring the submission of orders to the appropriate payors and that the maximum amount of reimbursement was obtained. This conferred

upon the Relator a direct and independent knowledge of the Defendant's fraudulent conduct and enabled them to discover and investigate the routine and illegal practices of Defendant as alleged herein.

### A. Claims for reimbursement without required medical necessity and submission of false records establishing medical necessity.

54.   For Medicaid patients, each line item of wheel chair must be justified with a letter of medical necessity (hereafter "LMN") from a qualified provider in order for the product to be delivered to the patient.

55.   Both Medicare and Medicaid consider only a Physical Therapist, Occupational Therapist or a Doctor of Physical Medicine (Physiatrist) as qualified to provide medical justification on the LMN.

56.   Assistive Technology Professionals (hereafter, "ATP's") are essentially sales people. While they are have Rehabilitation Engineering and Assistive Technology Society of North America (RESNA) certifications, the vast majority of them have no clinical experience. NuMotion requires these individuals to do a seven-page assessment on patients, which is then sent to a Document Funding Center (DFC) for the generation of the LMN. The NuMotion employees that write the LMNs are physical or occupational therapists, but they have never seen the patients for whom they are writing the letter. Thus, the LMNs are written by NuMotion. Consequently, medical necessity was never independently established for these Medicaid patients.

57.   Kentucky Medicaid required that LMNs be generated by the patient's provider, not NuMotion. When Kentucky Medicaid began enforcing this rule against NuMotion, the company, by and through Teresa Glass Owens, simply removed the language on the LMNs showing that they were authored by NuMotion employees. Thus,

Defendant still continued to generate the LMNs, an action which was material to Kentucky Medicaid's decision to reimburse, but simply removed any proof that the LMNs were not independently generated by providers. As such, Defendant submitted false or fraudulent records in order to receive reimbursement.

58.     Additionally, during Relator's tenure with the company, Defendant used unqualified staff to perform a number of services at the Indiana location, including screenings and assessments to certify patients to receive power equipment.

59.     At all times, Defendant knew that, due to these false and material certifications, these claims for payment were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

### B.     Use of letters of medical necessity as kickbacks to medical providers.

60.     NuMotion's drafting of LMNs was used as a marketing tool to induce referrals from providers, because providers frequently find the drafting of the LMNs to be arduous and time-consuming.

61.     Although it is time-consuming, it is the job of these providers to draft the documentation required for referrals and pre-authorizations, particularly when the required documentation relates to medical necessity.

62.     By undertaking the drafting of the LMNs for providers, NuMotion was performing a free service of value in exchange for a referral.

63.     The LMNs are a direct kickback for Medicaid patients, because the LMN is entirely generated by NuMotion rather than the provider.

64.     The scheme for Medicare patients is more subtle. Medicare does not accept the NuMotion LMN. They require an assessment completed by the physical therapist (PT), occupational therapist (OT), or physiatrist. When Medicare is involved, the ATPs use the 12-page assessment. The ATP's (regardless of clinical background) should not complete any part of the 12-page assessment except for the demographics. In actuality, they will complete a lot if not all of the assessment and have the PT/OT to sign off on it.

C.     **Coaching of providers.**

65.     In order for Medicare to reimburse power equipment, which is NuMotion's largest source of gross revenue, a seven element written order was required following a face to face visit with a doctor in which mobility issues were discussed between patient and physician. Thus, Medicare required both a seven element written order and an LMN.

66.     The seven element written order had to include the following seven elements: (1) patient's name; (2) patient's diagnosis; (3) description of equipment being ordered; (4) length of need; (5) doctor's name; (6) date of doctor's signature; and (7) the date of the face to face visit with the doctor.

67.     Defendant knew that the Medicare reimbursement decision hinged on a sufficient seven element written order being written, because claims were frequently denied on that basis.

68.     In order to decrease the number of denied claims, Defendant began coaching medical providers on how to write an effective order.

69.     In order for Kentucky Medicaid to reimburse Defendant for medical equipment, an LMN was required. While Defendant drafted the bulk of these LMNs (see above), some providers refused. Defendant coached the providers that wrote their own LMNs to ensure that the letters met the criteria for funding.

70.     Defendant's coaching was self-serving. Defendant had a direct interest in ensuring that these seven element written orders and LMNs complied with reimbursement standards.

71.     There was a direct nexus between the coaching, the development of a sufficient seven element written order or LMN, and the reimbursement decision. Thus, through this coaching, NuMotion influenced the reimbursement decisions of federal payors.

### D.     Other kickbacks to providers, such as gifts.

72.     At all times, Defendant routinely gave gifts to medical providers in exchange for kickbacks.

73.     Relator witnessed the Defendant provide meals and drinks to referring physicians or therapists in excess of the annual limits.

74.     Relator also witnessed Defendant paying for symposium costs for referring therapists.

75.     In addition, Defendant gave a large donation to the rehabilitation facility at Norton Hospital. The original agreement between Norton and Defendant provided that Defendant would give $100,000 to the facility. The Relator has personal knowledge of $20,000 being given in the fourth quarter of 2013, because the gift came out of his budget. Norton Hospital and its providers routinely provide referrals to NuMotion.

### E.     Billing previously used parts as "new" parts.

76.     Defendant billed and received reimbursement from Kentucky Medicaid, Indiana Medicaid, and Medicare for parts at a "new" rate when the parts were, in fact, used.

77.     Most insurances, including Medicare and Medicaid, pay using the HCPCS codes and the appropriate modifiers. These modifiers are NU-New, UE-Used, and RR-Rental. Neither Kentucky nor Indiana Medicaid would pay for equipment with the UE modifier.

78.     When a client gets a wheelchair, specifically a rental wheelchair, the company will bill Medicare using the RR modifier for the base equipment, and NU for all accessories that can be purchased; seat belts, elevating leg rests, wheel lock extensions, elevating armrests, etc.

79.     Many times the equipment is returned to the company before the 13-month rental period has been completed. This means that Medicare did not "purchase" the equipment and it is still company owned.

80.     The equipment will be cleaned and placed back into service. When the chair is sent out for subsequent use, the base is once again billed as RR, and the used accessories, those originally billed as NU are billed again as NU instead of the appropriate UE modifier signifying the items are used. This allows the company to be reimbursed for the accessories.

**F.     Failure to disclose true cost of certain medical devices and products in claim for reimbursement.**

81.     Both Indiana and Kentucky Medicaid has set fee schedules per HCPCS codes. Some codes are a flat rate, some are a percentage of the MSRP and others are a percentage above cost; usually cost plus 20%.

82.     When submitting the requests for authorization, the manufacturer's quotes are required.

20

83.     The company would show to Medicaid only the primary discounts and hide the secondary and tertiary discounts.

84.     Defendant frequently and intentionally omitted the information regarding secondary and tertiary discounts to Medicaid in order to achieve higher reimbursement rates despite the lowered costs of the goods, thus reaping greater profit. The provision of manufacturer quotes was material to the reimbursement decision, including the amount of reimbursement.

85.     If a mistake was made and the secondary discounts were accidentally provided, the company would misrepresent the applicability of the discounts with the reviewers at Medicaid stating those discounts were not a guarantee as they were tied to terms thereby ensuring the higher reimbursement.

**G.     Submission of other false records.**

86.     At times, especially at the end of month and moreover, the end of the year, items/services are being delivered/provided without the appropriate authorizations or documentation.

87.     The required paperwork will be signed by the client or responsible party and the date left blank. The company will fill in the date once all paperwork and/or authorizations are obtained. This is sometimes several months after the actual delivery or goods and service where provided.

88.     For reimbursement from Medicare, the seven element written order must be written and submitted within 30 days of the face-to-face visit with a doctor. Frequently, if the seven element order came after 30 days, the fax date on the order would be removed using the copy machine. Defendant would then submit the order without the fax date on it to Medicare.

89.     In addition, a high-dollar order may be nearly complete, missing only a component like a cushion. The company will provide the client with a loaner cushion so they can bill the entire order (including the cushion) before end of month or end of year. Once the omitted item is obtained, the company will replace the loaner component with the new items

## COUNT I
## VIOLATIONS OF THE FALSE CLAIMS ACT
## 31 U.S.C. § 3729(a)(1)(A)

90.     Relator restates and realleges the allegations contained in paragraphs 1 through 89 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

91.     The False Claims Act, 31 U.S.C. § 3729(a)(1)(A), provides in relevant part that any person who:

> knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus three times the amount of damages which the Government sustains because of the act of that person. . . .

92.     By virtue of the acts described herein, the Defendant knowingly presented, or caused to be presented, false or fraudulent claims for payment claims that did not accurately reflect the billing rate or services furnished to patients. The Defendant also knowingly presented, or caused to be presented, false or fraudulent claims for payment claims that the Defendant knew were non-reimbursable.   The Defendant knew these claims for payment or approval were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

93.     Unaware that Defendant submitted false statements and claims, the United States, the Kentucky Medicaid Program, and the Indiana Medicaid Program paid and continue to pay the false claims submitted for Defendant's goods. These claims would not have been paid but for Defendant's fraudulent and false statements.

94.     In reliance on the accuracy of Defendant's data, representations, and certifications, the United States has paid said claims and has suffered financial losses because of these acts by Defendant.

95.     Each claim presented or caused to be presented for mobility equipment or other medical equipment for which the LMN was generated by Defendant as set forth herein represents a false or fraudulent claim for payment under the FCA.

96.     Each claim presented or caused to be presented for mobility or other medical equipment referred to Defendant from a provider that received the LMN generation service as set forth herein represents a false or fraudulent claim for payment under the FCA.

97.     Each claim presented or caused to be presented for mobility or other medical equipment for which the authorship of the LMN was concealed as set forth herein represents a false or fraudulent claim for payment under the FCA.

98.     Each claim presented or caused to be presented for mobility or other medical equipment in which the patient was assessed in Defendant's own exam room or by Defendant's own employees as set forth herein represents a false or fraudulent claim for payment under the FCA.

99.     Each claim presented or caused to be presented for mobility or other medical equipment for which the provider was coached on the seven element order for

Medicare or the LMN for Medicaid as set forth herein represents a false or fraudulent claim for payment under the FCA.

100.    Each claim presented or caused to be presented for mobility or other medical equipment for which dates were changed as set forth herein represents a false or fraudulent claim for payment under the FCA.

101.    Each claim presented or caused to be presented for mobility or other medical equipment referred to Defendant from a provider receiving a kickback as set forth herein represents a false or fraudulent claim for payment under the FCA.

102.    Each claim presented or caused to be presented for mobility or other medical equipment for which certain parts or accessories were billed as new when they were, in fact, used as set forth herein represents a false or fraudulent claim for payment under the FCA.

103.    Each claim presented or caused to be presented for mobility or other medical equipment for which secondary or tertiary discounts from a manufacturer were not disclosed and/or hidden as set forth herein represents a false or fraudulent claim for payment under the FCA.

**COUNT II**
**VIOLATIONS OF THE FALSE CLAIMS ACT**
**31 U.S.C. § 3729(a)(1)(B)**

104.    Relator restates and realleges the allegations contained in paragraphs 1 through 86 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

105.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(B), provides in relevant part that any person who:

24

knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus three times the amount of damages which the Government sustains because of the act of that person. . . .

106.    By virtue of the acts described herein, Defendant knowingly made, used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims for payment. Defendant knew that the records or statements were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

107.    Unaware that Defendant submitted, or caused to be submitted, false records and/or statements, the United States and the Kentucky Medicaid Program paid and continue to pay the false claims submitted for Defendant's services. These claims would not have been paid but for Defendant's fraud and false statements.

108.    In reliance on the accuracy of Defendant's' data, representations, and certifications, the United State has paid said claims and has suffered financial losses because of these acts by Defendant.

109.    Each statement or record relating to mobility equipment or other medical equipment for which an LMN was generated by Defendant as set forth herein represents a false or fraudulent statement or claim that was material to reimbursement of a false or fraudulent claim for payment under the FCA.

110.    Each statement or record relating to mobility or other medical equipment referred to Defendant from a provider that received the LMN generation service as set forth herein represents a false or fraudulent statement or claim that was material to reimbursement of a false or fraudulent claim for payment under the FCA.

111.     Each statement or record relating to mobility or other medical equipment for which the authorship of the LMN was concealed as set forth herein represents a false or fraudulent statement or claim that was material to reimbursement of a false or fraudulent claim for payment under the FCA.

112.     Each statement or record relating to mobility or other medical equipment in which the patient was assessed in Defendant's own exam room  or by Defendant's own employees as set forth herein represents a false or fraudulent statement or claim that was material to reimbursement of a false or fraudulent claim for payment under the FCA.

113.     Each statement or record relating to mobility or other medical equipment for which the provider was coached on the seven element order for Medicare or the LMN for Medicaid as set forth herein represents a false or fraudulent statement or claim that was material to reimbursement of a false or fraudulent claim for payment under the FCA.

114.     Each statement or record relating to mobility or other medical equipment for which dates were changed as set forth herein represents a false or fraudulent statement or claim that was material to reimbursement of a false or fraudulent claim for payment under the FCA.

115.     Each statement or record relating to mobility or other medical equipment that was referred to Defendant from a provider receiving a kickback as set forth herein represents a false or fraudulent statement or claim that was material to reimbursement of a false or fraudulent claim for payment under the FCA.

116.     Each statement or record relating to mobility or other medical equipment for which certain parts or accessories were billed as new when they were, in fact, used as set forth herein represents a false or fraudulent statement or claim that was material to reimbursement of a false or fraudulent claim for payment under the FCA.

117.     Each statement or record relating to mobility or other medical equipment for which secondary or tertiary discounts from a manufacturer were not disclosed and/or hidden as set forth herein represents a false or fraudulent statement or claim that was material to reimbursement of a false or fraudulent claim for payment under the FCA.

## COUNT III
## VIOLATIONS OF THE FALSE CLAIMS ACT
### 31 .S.C. § 3729(a)(1)(G)

118.     Relator restates and realleges the allegations contained in paragraphs 1 through 98 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

119.     The False Claims Act, 31 U.S.C. § 3729(a)(1)(G), provides in relevant part that any person who:

> knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus three times the amount of damages which the Government sustains because of the act of that person. . . .

120.     By virtue of the acts described herein, Defendant knowingly made, used, or caused to be made or used, false or fraudulent records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government. Defendant knew that the records or statements were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

121.    Unaware that Defendant had improperly retained an overpayment, the United States, the Kentucky Medicaid Program, and the Indiana Medicaid Program paid and continue to pay the false claims submitted for Defendant's medical services. These claims would not have been paid but for Defendant's fraud and false statements.

122.    In reliance on the accuracy of Defendant's' data, representations, and certifications, the United State has paid said claims and has suffered financial losses because of these acts by Defendant.

**COUNT IV**
**VIOLATION OF THE INDIANA FALSE CLAIMS AND**
**WHISTLEBLOWER PROTECTION ACT**

123.    Relator repeats, re-alleges, and reasserts each and every allegation contained within the preceding paragraphs, as though set forth fully herein.

124.    This is a claim for penalties and treble damages under the Indiana False Claims and Whistleblower Protection Act, Indiana Code § 5-11-5.5.-2.

125.    By virtue of the acts described above, Defendant, for the purpose of defrauding the Indiana State Government, knowingly presented and/or caused to be presented false claims for payment or approval under Medicaid and other Indiana State funded programs to officers or employees of the state within the meaning of the Indiana False Claims Act.

126.    By virtue of the acts described above, Defendant, for the purpose of defrauding the Indiana State Government, knowingly made, used, and/or caused to be made or used, false records or statements to get false claims paid or approved under Medicaid and other Indiana State funded programs within the meaning of Indiana False Claims Act.

127.   As a result, Indiana State monies were lost through payments made in respect of the claims and other costs were sustained by the Indiana State Government.

128.   Therefore, the Indiana State Government has been damaged in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Relator prays that this District Court enter judgment on behalf of Relator and against Defendant in Counts I-IV, respectively, for the following:

a.   Damages in the amount of three (3) times the actual damages suffered by the United States Government as a result of each Defendant's conduct;

b.   Civil penalties against the Defendants, respectively, equal to not less than $5,500 and not more than $11,000 (adjusted for inflation according to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461), for each violation of 31U.S.C. § 3729;

c.   The fair and reasonable sum to which Relator is entitled under 31 U.S.C. § 3730(b) and Indiana Code § 5-11-5.5.-6; additionally, Relator is entitled, in equity, to recover attorneys' fees and costs.

d.   All costs and expenses of this litigation, including statutory attorneys' fees and costs of court;

e.   Pre-judgment and post-judgment, as appropriate, interest at the highest rate allowed by law;

f.   Relator's individual damages, if any, which may be alleged; and

g.   All other relief on behalf of Relator or the United States Government to which they may be justly entitled, under law or in equity, and the District Court deems just and proper.

h.    An award to Relator of the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and Indiana Code § 5-11-5.5.-6 set forth above, including the costs and expenses of this action and reasonable attorneys' fees;

i.    Such other, further and different relief, whether preliminary or permanent, legal or equitable, as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Relator demands trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh Amendment to the U.S. Constitution.

Respectfully submitted,

GOLDEN LAW OFFICE, PLLC

Justin S. Peterson
Mary Lauren Melton
771 Corporate Drive, Suite 750
Lexington, Kentucky 40503
Telephone:    (859) 469-5000
Facsimile:      (859) 469-5001
jpeterson@goldenlawoffice.com
mary@goldenlawoffice.com
COUNSEL FOR PLAINTIFF

Mark A. Wohlander
Mark@wohlanderlaw.com
Wohlander Law Office, PSC
P.O. Box 910483
Lexington, Kentucky 40591
Telephone: (859) 309-1691
Facsimile: (859) 309-1698
Cellular: (859) 361-5604
CO-COUNSEL FOR RELATOR

Benjamin J. Vernia
bvernia@vernialaw.com
The Vernia Law Firm
1455 Pennsylvania Ave., N.W.
Suite 400
Washington, D.C. 20004
Telephone:  (202) 349-4053
Cellular: (703) 283-7093
CO-COUNSEL FOR RELATOR

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Complaint filed under seal, pursuant to 31 U.S.C. § 3730, was sent to the following:

Hon. Jefferson Sessions
Attorney General
of the United States
US Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

Carlton S. Shier, IV
United States Attorney
for the Eastern District
of Kentucky
260 West Vine Street, Suite 300
Lexington, Kentucky, 40507-1671

COUNSEL FOR PLAINTIFF

4838-5939-7451, v. 1

31